

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### LUFKIN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| | § | |
| **VS.** | § | **CASE NO. 9:06-CR-30(3)** |
| | § | |
| **GILBERTO VEGA** | § | |

## FINDINGS OF FACT AND RECOMMENDATION ON GUILTY PLEA
## BEFORE THE UNITED STATES MAGISTRATE JUDGE

The District Court referred this matter to the undersigned United States Magistrate Judge for administration of a guilty plea and allocution under Rules 11 and 32 of the Federal Rules of Criminal Procedure. Magistrates have the statutory authority to conduct a felony guilty plea proceeding as an "additional duty" pursuant to 28 U.S.C. § 636(b)(3).  *United States v. Bolivar-Munoz*, 313 F.3d 253, 255 (5th Cir. 2002), *cert. denied,* 123 S. Ct. 1642 (2003).

On February 21, 2007, this cause came before the undersigned United States Magistrate Judge for entry of a guilty plea by the Defendant, Gilberto Vega, on **Count I** of the charging Second Superseding Indictment filed in this cause.  Count I of the Second Superseding Indictment charges that from on or about some time in 2002 and continuing thereafter up to and

1

including the 8th day of June, 2006, in the Eastern District of Texas and elsewhere, Gilberto Vega, a/k/a "Tiny," and twenty-four other named defendants, and others both known and unknown to the Grand Jury, did knowingly and intentionally conspire with other persons to knowingly and intentionally distribute and possess with intent to distribute 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine, 50 grams or more of a mixture or substance containing a detectable amount of cocaine base aka "crack cocaine," a Schedule II controlled substance, and 100 kilograms or more of a mixture or substance containing a detectable amount of marijuana, a Schedule I controlled substance, all in violation of Title 21, United States Code, Section 846.

Defendant, Gilberto Vega, entered a plea of guilty to Count I of the Second Superseding Indictment into the record at the hearing.

After conducting the proceeding in the form and manner prescribed by Federal Rule of Criminal Procedure 11 the Court finds:

a.      That Defendant, after consultation with counsel of record, has knowingly, freely and voluntarily consented to the administration of the guilty plea in this cause by a United States Magistrate Judge in the Eastern District of Texas subject to a final approval and imposition of sentence by the District Court.

b.      That Defendant and the Government have entered into a plea agreement which was disclosed and addressed in open court, entered into the record, and placed under seal.

c.      That Defendant is fully competent and capable of entering an informed plea, that Defendant is aware of the nature of the charges and the consequences of the plea, and that the

plea of guilty is a knowing, voluntary and freely made plea.  Upon addressing the Defendant personally in open court, the Court determines that Defendant Gilberto Vega's plea is voluntary and did not result from force, threats or promises.  *See* Fed. R. Crim. P. 11(b)(2).

      d.    That Defendant's knowing, voluntary and freely made plea is supported by an independent factual basis establishing each of the essential elements of the offense and Defendant realizes that his conduct falls within the definition of the crimes charged under 21 U.S.C. § 846.

## STATEMENT OF REASONS

      As factual support for Defendant's guilty plea, the government presented the following evidence, which was admitted into the record at the plea hearing.  *See Factual Resume.*  If the case proceeded to trial, the Government and Defendant agreed that the Government would prove, beyond a reasonable doubt, each and every essential element of the charging offenses charged in Count I of the Second Superseding Indictment.

      Specifically, in support, the Government would  establish, through sworn testimony and evidence, including expert witnesses and admissible exhibits, the following facts, as stated in the *Factual Resume:*

      Defendant Vega was involved in a conspiracy to distribute controlled substances that involved **JOSE REYES GARCIA, JR.,** aka **JOSE REYES GARCIA;   JUAN RAUL HIGUERA** (hereinafter referred to as **HIGUERA),** aka **RAUL HIGUERA,** aka **JUAN GARCIA,** aka **"Smiley"** aka **JUAN GONZALEZ,** aka **JUANRIVERA,** and aka **JUAN RAUL HIGUERA; RODOLFO AGUILAR** ("Aguilar")**; JAIRO ROMERO-FRAUSTO** (hereinafter

referred to as **ROMERO-FRAUSTO**); **OSCAR APARICIO SOLARES,** (hereinafter referred to as **SOLARES**) aka **"Flaco"; RICHARD SOLIS,** (hereinafter referred to as **SOLIS**) aka **"Roach"; CHRISTIAN MOYEDA** (hereinafter referred to as **MOYEDA**); **YESIKA CARRILLO** (hereinafter referred to as **CARILLO**), **MIGUEL CANEDO** (hereinafter referred to as **CANEDO), ANTONIO SANTOYA ALVAREZ** (hereinafter referred to as **ALVAREZ**) aka **"Toño", JAVIER LOPEZ** (hereinafter referred to as **LOPEZ), RUBEN ESPEJO-LOPEZ** (hereinafter referred to as **ESPEJO**), **PABLO PASQUAL** aka **FRANCISCO MALDONADO** (hereinafter referred to as **PASQUAL**), **VICTOR SCOTT INGRAM** (hereinafter referred to as **INGRAM),** and **JUAN ANTONIO RAMOS** (hereinafter referred to as **RAMOS),** from sometime in November 2002 up and including June 8, 2006.

The evidence will establish that various members of the conspiracy would travel to locations along the Texas/Mexico border to purchase cocaine and/or marijuana and have the cocaine and/or marijuana transported to Angelina and Nacogdoches Counties. These counties are located in the Eastern District of Texas. The conspiracy would distribute cocaine, cocaine base, marijuana, and methamphetamine in both Angelina and Nacogodoches Counties. Additionally, this conspiracy would also distribute cocaine and marijuana to Oklahoma, Alabama, and Georgia. Evidence will also establish that a network of more than twenty individuals were involved in a widespread drug trafficking organization in the Eastern District of Texas and the Southern District of Texas.

In 2004, Cooperating Subject 1 (CS-1) identified **REYES** as the owner of the El Castillo Club 2003. CS-1 identified **REYES** as a major distributor of multi-kilograms of cocaine. CS-1

4

advised that CS-1 was a close associate of Julio Esparza.  CS-1 advised that **GUTIERREZ** delivered cocaine and marijuana for **REYES** to Julio Esparza.

On December 16, 2004, **REYES** was stopped subsequent to traffic violations an interviewed by law enforcement.  **REYES** stated he was the manager of the El Castillo Club 2003 on U.S. Highway 59 in Nacogdoches, Texas and stated he lived at 1314 Virginia Ave., Nacogdoches, Texas.

On June 10, 2005, ATF Confidential Informant 160 (hereinafter referred to as CI-160) and Confidential Informant 163 (hereinafter referred to as CI-163) met Alma Garcia (wife of **REYES**) at the El Castillo Club 2003 in Nacogdoches, Texas.   CI-160 and CI-163 inquired whether Alma Garcia knew someone who could sell them narcotics.  Approximately one hour later, an individual identified as **HIGUERA**, identified himself as the nephew of Alma Garcia, advised that he would meet them the next day to discuss selling narcotics to CI-160 and CI-163.

On June 11, 2005, CI-160 and CI-163 met with **HIGUERA** at the Las Arandas Restaurant in Nacogdoches, Texas to discuss purchasing cocaine from **HIGUERA**.  After negotiating the purchase of two ounces of cocaine with **HIGUERA**, CI-160 and CI-163 purchased approximately two ounces of powder cocaine from **LOPEZ**.  **LOPEZ** is a subordinate of  **HIGUERA** within the organization.  Physical surveillance and consensually recorded telephone calls between **HIGUERA** and CI-160 verify this transaction.  This evidence was submitted to the Department of Public Safety Crime Lab where it was tested and it was in fact 53.94 grams of cocaine.

On July 2, 2005, CI-160 and CI-163 introduced Confidential Informant 152 (hereinafter

referred to as CI-152) as a nephew who was interested in purchasing narcotics and/or weapons from **HIGUERA**.  On this same date, CI-152 placed telephone consensually recorded calls to **HIGUERA** to arrange for the purchase of cocaine.  During these recorded telephone conversations, arrangements were made for CI-152 to purchase two ounces of cocaine from **HIGUERA** for $1,400.  **HIGUERA** and **LOPEZ** arrived at the agreed location and **HIGUERA** sold CI-152 two ounces of cocaine for $1,400.  Physical surveillance and CI-152's consensually recorded conversation verified this transaction. This evidence was submitted to the Department of Public Safety Crime Lab where it was tested and it was in fact 55.07 grams of cocaine.

From July 12, 2005- July 14, 2005, CI-152 made contact with **HIGUERA** to arrange for the purchase of cocaine.  On July 14,2005, CI-152 followed **HIGUERA's** directions and met **LOPEZ** at a previously arranged location and purchased two ounces of cocaine for $1,300. Physical surveillance and CI-152's consensually recorded conversations verified this transaction. This evidence was submitted to the Department of Public Safety Crime Lab where it was tested and it was in fact 57.19 grams of cocaine.  From  August 08, - August 10, 2005, CI-152 placed telephone calls to **HIGUERA** to arrange for the purchase of crack cocaine.  During these consensually recorded telephone conversations, arrangements were made for CI-152 to purchase two ounces of crack cocaine from **HIGUERA** for $1,300.  On August 10, 2005, the crack cocaine was delivered to CI-152 by **ESPEJO**, as had been arranged by **HIGUERA**.  Physical surveillance and CI-152 's consensually recorded conversation verified this transaction.  This evidence was submitted to the Department of Public Safety Crime Lab where it was tested and it was in fact 43.82 grams of cocaine base.

From  August 08, - August 10, 2005, CI-152 placed telephone calls to **HIGUERA** to arrange for the purchase of crack cocaine.   During these consensually recorded telephone conversations, arrangements were made for CI-152 to purchase two ounces of crack cocaine from **HIGUERA** for $1,300.  On August 10, 2005, the crack cocaine was delivered to CI-152 by **ESPEJO**, as had been arranged by **HIGUERA**.   Physical surveillance and CI-152 's consensually recorded conversation verified this transaction.  This evidence was submitted to the Department of Public Safety Crime Lab where it was tested and it was in fact 43.82 grams of cocaine base.

On September 1, 2005, **HIGUERA** arranged for CI-152 to meet with **ESPEJO** later that day in Nacogdoches, Texas, to purchase two ounces of cocaine for $1,300. CI-152 met **ESPEJO** in Nacogdoches, Texas, and purchased the two ounces of cocaine for $1,300.   Physical surveillance and CI-152's consensually recorded conversation verified this transaction.   This evidence was submitted to the Department of Public Safety Crime Lab where it was tested and it was in fact 55.14 grams of cocaine.

On September 9, 2005,  after negotiating with **HIGUERA** over the phone, CI-152 met with **ESPEJO** and purchased approximately one ounce of methamphetamine and two pistols. CI-152 was instructed to follow **ESPEJO** to 2415 Pettit St, Nacogdoches,Texas, where CI-152 met with  **HIGUERA** and purchased an additional assault rifle and shotgun from **HIGUERA**. CI-152 entered the residence at 2415 Pettit St, Nacogdoches,Texas, where **HIGUERA** provided CI-152 with the assault rifle and shotgun.  CI-152 paid **HIGUERA** for the shotgun and rifle and departed the residence.  Physical surveillance and consensually recorded conversations verified

this transaction.  This evidence was submitted to the Drug Enforcement Administration Crime Lab where it was tested and it was in fact 25.4 grams of methamphetamine.

On September 15, 2005, after negotiating with **HIGUERA** over the phone, CI-152 purchased approximately one ounce of methamphetamine from **ESPEJO** at 1221 Rodessa St, Nacogdoches,Texas.  During the transaction between CI-152 and **ESPEJO**, **ESPEJO** met with CI-152 in CI-152's vehicle and gave CI-152 what appeared to be two ounces of methamphetamine.  CI-152 inquired about the amount of methamphetamine.  **ESPEJO** contacted **HIGUERA** by telephone, thereafter CI-152 was advised that **HIGUERA** was on his way to 1221 Rodessa St., Nacogdoches, Texas.  **HIGUERA** arrived and met with **ESPEJO** on the curtilage of the residence.  Subsequently, both **HIGUERA** and **ESPEJO** entered the residence.  Shortly thereafter, **HIGUERA** exited the residence and handed CI-152 approximately one ounce of methamphetamine.  Physical surveillance and consensually recorded conversations verified this transaction. This evidence was submitted to the Drug Enforcement Administration Crime Lab where it was tested and it was in fact 26.8 grams of methamphetamine.

On September 29, 2005, after negotiating with **HIGUERA** over the phone, CI-152 purchased approximately three ounces of cocaine from **ESPEJO** at 1221 Rodessa St, Nacogdoches, Texas.  Physical surveillance and CI-152's consensually recorded conversation verified this transaction.  This evidence was submitted to the Department of Public Safety Crime Lab where it was tested and it was in fact 76.64 grams of cocaine.

On October 1, 2005, **INGRAM**, was caught with 556 pounds of marijuana concealed in

the motorboat he was operating along the southern coast of Texas.  The motorboat was registered under an alias used by **HIGUERRA**.  **INGRAM** had been recruited by **ANDRADE** to fly to Texas, from California to transport the marijuana from South Texas up the Ship Channel to Corpus Christi.  During a subsequent debriefing, **INGRAM** stated that he had made two previous trips to go "fishing" in south Texas.  The first trip was in August, 2005, in which he went with **"JUAN GONZALEZ"** (a known alias of **HIGUERA**)  and "Roach"  (Previously identified as **SOLIS**).  The second trip was on Labor Day, September 5, 2005.  On this trip **OLMEDA** was stopped by a DPS Trooper at the Sarita U.S. Border Patrol checkpoint in South Texas.  **OLMEDA** was driving a vehicle that was rented by **INGRAM. OLMEDA** was towing an empty boat trailer that was registered under an alias name used by **HIGUERA**.  On this trip **INGRAM** was with **"JUAN GONZALEZ",** "Roach" and another male known to **INGRAM** only as "Enrique"**.  INGRAM** and the others were dropped off with the boat**.  INGRAM** stated that on his third trip on October 1, 2005, he had flown into Houston Hobby airport from California and had rented a grey Ford Expedition.  **INGRAM** then picked up **SOLIS** at a Shell gasoline station.  **INGRAM** stated he had been dropped off by **SOLIS** to navigate the same boat that had been used on the previous two trips. **INGRAM** identified **HIGUERA**  and **ESPEJO** as co-conspirators involved in the intercepted smuggling operation.  **INGRAM** advised DPS these individuals were gang members and **INGRAM** was in fear concerning his safety.  This evidence was submitted to the Department of Public Safety Crime Lab where it was tested and it was in fact 556 pounds of marijuana.

On October 21, 2005, CI-152 met **HIGUERA** at 1221 Rodessa St, Nacogdoches, Texas.

**HIGUERA** exited the residence and advised CI-152 that **HIGUERA** needed to go to the other house to get the stuff.  CI-152 followed **HIGUERA** to 2415 Pettit St, Nacogdoches, Texas.  CI-152 and **HIGUERA** entered the residence at 2415 Pettit St, Nacogdoches, Texas, where **HIGUERA** entered a back bedroom and retrieved a stainless steel revolver and handed it to CI-152.  CI-152 purchased the pistol from **HIGUERA**, one ounce of methamphetamine and one pound of marijuana.  CI-152 was instructed to travel to 1221 Rodessa St, Nacogdoches, Texas.  CI-152 knocked on the door at 1221 Rodessa St, Nacogdoches, Texas, where CI-152 was handed a plastic bag containing one ounce of methamphetamine and one pound of marijuana by **CARRILLO.**  This occurred on the porch of 1221 Rodessa St, Nacogdoches.  Physical surveillance and consensually recorded conversations verified this transaction.  This evidence was submitted to the Drug Enforcement Administration Crime Lab where it was tested and it was in fact 26.8 grams of methamphetamine.

On November 27, 2005, after a series of cellular telephone conversations between CI-152 and **HIGUERA**, CI-152 was advised to travel to 1221 Rodessa St, Nacogdoches, Texas to meet **ESPEJO**.  CI-152 met with **ESPEJO** where they entered the residence.  CI-152 purchased approximately one quarter kilogram of cocaine after weighing the suspected narcotics on the kitchen counter.  **ESPEJO**, **CARRILLO**, and a young child were present during the transaction.  **ESPEJO** took CI-152 to a back room of the residence and showed CI-152 a M-16 type rifle with a bi-pod and scope.  CI-152 was unable to purchase the rifle because **ESPEJO** advised that this particular firearm had already been sold.  **ESPEJO** told CI-152 that he would get one just like it for CI-152.  Physical surveillance and consensually recorded conversations verified this

10

transaction.  This evidence was submitted to the Department of Public Safety Crime Lab where it was tested and it was in fact 243.62 grams of cocaine.

On December 9, 2005, undercover SA Benavides and CI-152 met **VEGA**, at the El Castillo Club 2003.  SA Benavides and CI-152 made contact with **VEGA** who was shooting pool with **REYES**.  **VEGA** identified himself as the head bouncer at the club.  SA Benavides and CI-152 informed **VEGA** they needed to talk to **HIGUERA** about purchasing cocaine from **HIGUERA**.  **VEGA** contacted **HIGUERA** using his cell phone.  **VEGA** told SA Benavides that the next time he could contact **VEGA** to purchase narcotics; that it came from the same source anyway.

On December 13, 2005, after negotiating with **HIGUERA** over the phone, CI-152 purchased approximately two ounces of cocaine and two pistols from **PASQUAL** at 1221 Rodessa St, Nacogdoches, Texas.  Physical surveillance and CI-152's consensually recorded conversation verified this transaction.  This evidence was submitted to the Department of Public Safety Crime Lab where it was tested and it was in fact 53.39 grams of cocaine.

On January 5, 2006, after negotiating with **HIGUERA** over the phone, CI-152 purchased approximately two ounces of crack cocaine from **CARRILLO** at 1221 Rodessa St, Nacogdoches, Texas.  During the transaction, CI-152 entered the residence at 1221 Rodessa St, Nacogdoches, Texas where **CARRILLO** directed CI-152 to a blue box on the counter and advised CI-152 that was his cocaine.  CI-152 paid **CARRILLO** $1200.00 and departed the residence with the blue box which contained approximately two ounces of crack cocaine.  Physical surveillance and consensually recorded conversations verified this transaction.  This

evidence was submitted to the Department of Public Safety Crime Lab where it was tested and it was in fact 23.57 grams of cocaine base.

On January 12, 2006, a federal court-ordered wire intercept was initiated on the telephone of **HIGUERA**.   On the same day, intercepted communications revealed that **HIGUERA** was enroute from Oklahoma to Nacogdoches, Texas returning with cash proceeds from drug transactions.   Surveillance was initiated on **HIGUERA** following him from Alto, Texas to 1501 W. Main St., Nacogdoches, Texas.   A pole camera positioned on 1501 W. Main, St., Nacogdoches, Texas established the residence as common meeting area for multiple co-conspirators of the organization.

On January 13, 2006, surveillance was conducted on **HIGUERA**, where investigators observed **HIGUERA** in Corrigan, Texas meet with **REYES**. On this date **REYES** was followed to Conroe, Texas where the surveillance was terminated.

On January 15, 2006, after negotiating with **HIGUERA** over the phone, CI-152 purchased approximately three ounces of crack cocaine and an assault pistol from **CARRILLO** at 1221 Rodessa St, Nacogdoches, Texas.   During the transaction, CI-152 entered the residence at 1221 Rodessa St, Nacogdoches, Texas where he contacted **CARRILLO**.   **CARRILLO** advised that the cocaine was on the arm of the living room couch in a cracker box.   CI-152 paid **CARRILLO** $1800.00 for the cocaine and inquired about the firearm CI-152 had discussed with **HIGUERA**.   **CARRILLO** informed CI-152 the firearm was stored in a vehicle outside the residence.   CI-152 retrieved the firearm from the vehicle after CI-152 had paid **CARILLO** for the firearm.   Physical surveillance and consensually recorded conversations verified this

12

transaction.  This evidence was submitted to the Department of Public Safety Crime Lab where it was tested and it was in fact 85.70 grams of cocaine.

On January 17, 2006, surveillance was initiated on **HIGUERA**.  **HIGUERA** drove to a residence located at the corner of Texas Highway 103 West and Texas Highway 706 in Lufkin, Texas.  **HIGUERA** was then followed to 2415 Pettit St, Nacogdoches, Texas.  **HIGUERA** was then followed to 1501 W. Main, Nacogdoches, Texas where he met with two other individuals.  **HIGUERA** and the other individuals left in separate vehicles, the unidentified driver of a gray Ford truck was stopped on traffic violations and identified as **SOLARES**.  Multiple wire intercepts were obtained identifying **SOLARES** as a narcotics trafficker.

On January 19, 2006, SA Benavides purchased approximately three ounces of cocaine from **VEGA** in the parking lot of the El Castillo Club 2003 on U.S. Highway 59 South in Nacogdoches, Texas.  Physical surveillance and consensually recorded conversations verified this transaction.  This evidence was submitted to the Department of Public Safety Crime Lab where it was tested and it was in fact 83.99 grams of cocaine.

On January 24, 2006, during a wire intercept **REYES** inquired as to how much **HIGUERA** would charge him for delivering the "shit" (referring to cocaine) to Oklahoma and for bringing back the "paperwork" (meaning cash) from Oklahoma.  **HIGUERA** calculated that the "four" (meaning four kilograms of cocaine) that were previously delivered would mean that **HIGUERA** would be bringing back "sixty-eight pesos" (meaning $68,000.00).  **HIGUERA** told **REYES** that he would charge him $250 for each one (meaning each kilogram of cocaine that had been delivered) but then **HIGUERA** reduced the delivery charge to a total of $800 and

stated that **REYES** would get sixty-seven and some odd (meaning $67,200).  Then **REYES**

inquired as to which vehicle **HIGUERA** would be taking on this trip to Oklahoma.  **HIGUERA**

stated that he would be taking the small one (investigators conducting surveillance observed

**HIGUERA** driving a green Chevrolet Cavalier with Texas license plate Y25 KYB) unless

**REYES** wanted **HIGUERA** to take the white one (meaning the white Lincoln Towncar with

Texas license plate 643 FPK).  **REYES** then expressed his desire to have a vehicle modified in

Monterrey, Mexico, so that the cash and/or drugs could be secreted in a hidden compartment.

**REYES** discussed getting the boat thing going with "this guy over there" (**REYES** is referring to

utilizing **INGRAM** to transport marijuana from South Texas).  **REYES**  again inquired of

**HIGUERA** about acquiring a hidden compartment from "that fella".  **REYES** then discussed

getting a vacuum sealing machine for sealing up the narcotics to make them more compact.

**REYES** discussed calculating "the ticket" (meaning the price per kilogram to be charged for the

drugs that were going to be delivered to Oklahoma.).  **HIGUERA** advised **REYES** that the

customer would agree to pay $16,500 per kilogram if they don't cut it up (meaning to open up

the sealed kilograms of cocaine to add an inert agent to increase the quantity and thus increase

the profit margin).  **REYES** asked **HIGUERA** about **SOLARES**.  **HIGUERA** told **REYES** that

he would call **SOLARES** and ask **SOLARES** to call his boss to determine when **SOLARES**

could arrange a delivery of cocaine.

On January 25, 2006, **HIGUERA** was en route to Oklahoma City, Oklahoma to transport

narcotics and return with cash proceeds.  Agents observed the green Chevrolet Cavalier, Texas

license plate T25-YKB, known to be driven by **HIGUERA**, parked at 800 Lexington St #107,

Norman, Oklahoma.

On January 26, 2006, at approximately 10:30 a.m., Agents observed **HIGUERA** with an unidentified Hispanic male departing the residence located at 800 Lexington St #107, Norman, Oklahoma.

On January 26, 2006, during a wire intercept between **HIGUERA** and **REYES**, **HIGUERA** advised that **SOLARES** wanted **HIGUERA** to ask **"his boss"** (meaning **REYES**) for some money to give to **SOLARES** so that he could bring "a whole one" (meaning a kilogram of cocaine) as a sample.  In lieu of giving money to **SOLARES**, **HIGUERA** and **REYES** decided that **HIGUERA** would travel to Mexico with **SOLARES** to arrange the narcotics shipment from Mexico to Texas.

On January 27, 2006, after negotiating with **HIGUERA** over the phone, CI-152 purchased approximately three ounces of cocaine from an individual associated with **HIGUERA**.  Physical surveillance and consensually recorded conversations verified this transaction.  This evidence was submitted to the Department of Public Safety Crime Lab where it was tested and it was in fact 81.20 grams of cocaine.

On January 30, 2006, surveillance of **HIGUERA** was established and maintained following **HIGUERA** to the intersection of Texas Highway 103 and Texas Highway 706, where **HIGUERA** met with two individuals.  Wire intercepts revealed **HIGUERA** was traveling to Oklahoma City, Oklahoma to transport narcotics and collect cash proceeds from co-conspirators in Oklahoma City, Oklahoma.  Surveillance was maintained on **HIGUERA** and his unidentified companion through North Texas while **HIGUERA** was enroute to Oklahoma.

On February 3, 2006, after negotiating with **HIGUERA** over the phone, CI-152 purchased approximately two ounces of cocaine from an individual in Nacogdoches, Texas. During the transaction, CI-152 met the individual outside the residence at 1221 Rodessa St., Nacogdoches, Texas and asked CI-152 how much cocaine CI-152 wanted.  CI-152 advised the individual he needed two ounces and the individual returned to the residence where he met **CARRILLO** inside the residence.   Shortly thereafter, the individual returned with approximately two ounces of cocaine for CI-152.  CI-152 paid the individual $1300.00 for the cocaine and departed the location.   Physical surveillance and consensually recorded conversations verified this transaction.  This evidence was submitted to the Department of Public Safety Crime Lab where it was tested and it was in fact 55.81 grams of cocaine.

On February 7, 2006, a federal court ordered wire intercept was initiated on the telephone utilized by **REYES** to conduct narcotics transactions.

On February 9, 2006, after negotiating with **HIGUERA** over the phone, CI-152 purchased approximately two ounces of cocaine, an assault rifle, and a pistol from an individual at 1221 Rodessa, Nacogdoches, Texas.  During the transaction the individual met CI-152 at Rodessa St and advised CI-152 to follow the individual to a remote county road where CI-152 purchased the narcotics and firearms.   Physical surveillance and consensually recorded conversations verified this transaction.  This evidence was submitted to the Department of Public Safety Crime Lab where it was tested and it was in fact 54.15 grams of cocaine.

On February 16, 2006, Texas Department of Public Safety (DPS), Sergeant (Sgt.) Mike McClain, working in a undercover capacity purchased three ounces of cocaine and one pound of

16

marijuana from **MOYEDA** and **AGUILAR**.   During the transaction, DPS Sgt. McClain followed **MOYEDA** to 316 Falcon Ave, where **MOYEDA** obtained the narcotics from **AGUILAR**.   **MOYEDA** delivered the narcotics to Sgt. McClain.   Physical surveillance and consensually recorded conversations verified this transaction.   This evidence was submitted to the Department of Public Safety Crime Lab where it was tested and it was in fact 82.13 grams of cocaine.

On February 23, 2006, Sgt. McClain purchased three ounces of cocaine from **MOYEDA** and **AGUILAR**.   During the transaction, agents surveilled **AGUILAR**'s residence and observed **MOYEDA** pick up the narcotics from **AGUILAR**'s residence prior to the delivery by **MOYEDA** to Sgt. McClain. Physical surveillance and consensually recorded conversations verified this transaction.   This evidence was submitted to the Department of Public Safety Crime Lab where it was tested and it was in fact 81.57 grams of cocaine.

On February 23, 2006, during a wire intercept between **REYES** and **GUTIERREZ**, **REYES** advised **GUTIERREZ** that it would be good if **GUTIERREZ** lined his people up so **GUTIERREZ** could get a good amount of marijuana.   **GUTIERREZ** mentioned that he had three people that could sell stuff for him and he was hoping that he could eventually get to the point where he was selling fifty pounds a week with the people that he had lined up.   **REYES** was prepared to give **GUTIERREZ** one kilogram of cocaine, some methamphetamine, and about 200 pounds of marijuana.   **REYES** would give **GUTIERREZ** a month to sell the drugs and have **GUTIERREZ** pay him every Monday what ever money **GUTIERREZ** had collected.

Again, on February 23, 2006, during a wire intercept between **REYES** and

GUTIERREZ, **REYES** instructed **GUTIERREZ** to contact "Beto" so that **REYES** can send a kilograms of cocaine to "Beto".   **REYES** told **GUTIERREZ** to negotiate the price but if "Beto" wants to pay $18,000.00 then **REYES** will send the cocaine up there but **GUTIERREZ** will be the man doing everything over there.

On February 26, 2006, wire intercepts revealed the organization had received a large delivery of narcotics in Nacogdoches, Texas.  The wire intercepts revealed that **SOLARES** had obtained the narcotics delivery at 1501 W. Main St, Nacogdoches, Texas.   The intercepted conversation between **SOLIS** and **REYES** provided information that **REYES** was traveling to inspect the recently received narcotics.  Agents conducted a surveillance of **REYES** departing 1314 Virginia, Nacogdoches, Texas and traveled directly to 1501 W. Main, Nacogdoches, Texas where **REYES** remained for several minutes.  Agents observed **REYES** leaving the residence carrying a duffle bag which he put in his white Chevrolet Tahoe and returned directly to 1314 Virginia, Nacogdoches, Texas.  A short time later, **REYES** was observed placing what appeared to be the same duffle bag in a small blue car parked adjacent to the residence at 1314 Virginia, Nacogdoches, Texas.  (This we know from a previous wire intercept is commonly used by Reyes to receive money).  **REYES** departed 1314 Virginia, Nacogdoches, Texas  and returned to 1501 W. Main, Nacogdoches, Texas.  Approximately ten minutes later **SOLIS**, arrived at 1314 Virginia, Nacogdoches, Texas, walked over to the blue vehicle looked inside the vehicle and departed 1314 Virginia, Nacogdoches, Texas.  **REYES** departed 1501 W. Main, Nacogdoches, Texas and returned directly to 1314 Virginia, Nacogdoches, Texas.  Approximately ten minutes later **SOLIS** arrived at 1314 Virginia, Nacogdoches, Texas and had a conversation with **REYES**

18

in the carport located at 1314 Virginia, Nacogdoches, Texas for several minutes. Upon **SOLIS'** departure from 1314 Virginia, Nacogdoches, Texas, **SOLIS** retrieved the duffle bag from the blue car adjacent to the residence. **SOLIS** traveled with an unidentified Hispanic female and young child directly to a residence on Nacogdoches County Road 6102 where he droped off the unidentified Hispanic female and young child. **SOLIS** continued to a residence located at Box 325 Nacogdoches County Road (NCR) 6101 where he met with several unidentified Hispanic males for several minutes. **SOLIS** departed Box 325 NCR 6101 and drove south on U.S. Highway 59 to Lufkin, Texas. Agents followed **SOLIS** to 308 Riveroak Rd., Lufkin, Texas where they eventually terminated the surveillance.

On February 26, 2006, there was an intercepted conversation between **REYES** and **ALVAREZ**. **REYES** asked **ALVAREZ** if he was going to get some wal-mart (wal-mart is a code word for cocaine) because **REYES** is going to get rid of it. **ALVAREZ** told **REYES** yes and that he had already worked the stuff that **REYES** gave him. They had a discussion about whether or not **REYES** had cut up the stuff that **REYES** had given to **ALVAREZ** because the people from around Palestine where complaining about it. **REYES** denied cutting up the narcotics.

On March 1, 2006, there was an intercepted conversation between **REYES** and **AGUILAR**. They discussed **SOLIS** receiving two hundred pounds of marijuana. **AGUILAR** agreed to take one hundred pounds of the marijuana and will try and sell it for either $275.00 or $310.00. The price fluctuated because some of the marijuana was not good quality.

On March 2, 2006, Sgt. McClain, working in an undercover capacity, purchased

19

approximately two ounces of cocaine from **MOYEDA**. Physical surveillance and consensually recorded conversations verified this transaction.  This evidence was submitted to the Department of Public Safety Crime Lab where it was tested and it was in fact 54.77 grams of cocaine.

On March 3, 2006, **GUTIERREZ** was stopped in Pearl City, Mississippi by Scott Kelly, an Investigator for the Pearl City Police Department, for no tag light.  While conducting his traffic investigation Investigator Kelly asked for and received consent to search the vehicle driven by **GUTIERREZ**.  A search of the vehicle resulted in the seizure of $27,900.00 in cash.  This was in a Wal-mart bag underneath the back seat of the vehicle.  **GUTIERREZ** was arrested and charged with money laundering.

On March 3, 2006, a wire intercept conversation of **REYES** related that a traffic stop on **GUTIERREZ**, in Pearl City, Mississippi had resulted in the seizure of $29,000.00 in cash.  This was the cash proceeds of **REYES** and his drug trafficking organization.  Surveillance of **REYES** witnessed **REYES** outside his residence during this recorded wire intercept.

On March 4, 2006, a wire intercept revealed that **REYES** was on his way to meet **SOLIS**.  Surveillance of **REYES** was initiated at the El Castillo Club 2003 on U.S. Highway 59 South and maintained until **REYES** arrived at 308 Riveroak, Lufkin, Texas.  **REYES** departed 308 Riveroak and returned directly to the El Castillo Club 2003 on U.S. Highway 59 South.

On March 5, 2006, after negotiating with **HIGUERA** over the phone, CI-152 purchased approximately two ounces of cocaine from two unidentified Hispanic males at 2415 Pettit St, Nacogdoches, Texas.   CI-152 wearing covert video surveillance recorded the unidentified Hispanic males retrieved the two ounces of cocaine from a vehicle on the curtilage of 2415 Pettit

St., Nacogdoches, Texas.  This evidence was submitted to the Department of Public Safety Crime Lab where it was tested and it was in fact 56.53 grams of cocaine.

March 6, 2006, SA Benavides purchased approximately three ounces of cocaine from **VEGA** in the parking lot of the El Castillo Club 2003.  Ariel surveillance followed **VEGA** from the delivery at the El Castillo Club 2003 to his residence located at 1359 Farm to Market Road 843, Lufkin, Texas.  Physical surveillance and consensually recorded conversations verified this transaction.  This evidence was submitted to the Department of Public Safety Crime Lab where it was tested and it was in fact 82.68 grams of cocaine.

On March 9, 2006, CI-152 purchased approximately two ounces of cocaine and a assault pistol from **HIGUERA** in front of 2415 Pettit, Nacogdoches, Texas.  Just prior to **HIGUERA**'s arrival at 2415 Pettit, Nacogdoches, Texas, CI-152 contacted **CARRILLO** in person at 2410 Pettit, Nacogdoches, Texas.  **CARRILLO** contacted **HIGUERA**, by telephone, and advised CI-152 **HIGUERA** was on his way.  **HIGUERA** arrived in front of 2415 Pettit, Nacogdoches, Texas, where CI-152 was awaiting his arrival.  CI-152 retrieved the firearm and cocaine from the vehicle **HIGUERA** was diving, completed the transaction and departed 2415 Pettit, Nacogdoches, Texas.  After the transaction was completed agents observed the vehicle **HIGUERA** was driving parked in the driveway of 2410 Pettit St, Nacogdoches, Texas.  This evidence was submitted to the Department of Public Safety Crime Lab where it was tested and it was in fact 56.53 grams of cocaine.

On March 24, 2006, at Lufkin, Texas, Sergeant McClain made a drug purchase of one quarter kilogram of cocaine from **AGUILAR** and **MOYEDA**.  Physical surveillance and

consensually recorded conversations verified this transaction. This evidence was submitted to the Department of Public Safety Crime Lab where it was tested and it was in fact 251.43 grams of cocaine.

On April 13, 2006, CI-152 purchased approximately two ounces of cocaine from an individual that **HIGUERA** described to CI-152 as **HIGUERA**'s right hand man and the individual **HIGUERA** had left in charge of drug distribution in **HIGUERA**'s absence. CI-152 purchased the two ounces at 2415 Pettit St, Nacogdoches, Texas. (the unidentified individual was later identified as **ROMERO-FRAUSTO** during a traffic stop. **ROMERO-FRAUSTO**'s residence is listed in DPS records as 2410 Pettit St, Nacogdoches, Texas.) Physical surveillance and consensually recorded conversations verified this transaction. This evidence was submitted to the Department of Public Safety Crime Lab where it was tested and it was in fact 55.35 grams of cocaine.

On April 20, 2006, Sgt. McClain, working in an undercover capacity, purchased approximately one quarter kilogram of cocaine from **MOYEDA**. Subsequent to the delivery by **MOYEDA, AGUILAR** was stopped after committing a traffic violation and found to be in possession of approximately two pounds of marijuana. A search warrant was executed at 316 Falcon Ave, Lufkin, Texas (the residence of **AGUILAR**) where approximately sixty grams of cocaine, one pound of marijuana, twenty six thousand three hundred and thirty dollars in U.S. currency and two firearms were recovered. Subsequent to the previous operations a knock and talk was initiated at 160 Lariat Ln, Lufkin, Texas. Surveillance revealed that this residence was associated with **AGUILAR** and **MOYEDA**'s illegal drug activities. Consent to search was

obtained from the residents at 160 Lariat Ln.  Approximately 108 pounds of marijuana and 863 grams of cocaine, eight firearms, digital scales and a hydraulic press used to compact marijuana were recovered during the search at 160 Lariat Lane.  **RAMOS** was storing the narcotics for **AGUILAR**.  This evidence was submitted to the Department of Public Safety Crime Lab where it was tested and it was in fact 1,168.45 grams of cocaine and 104 pounds of marijuana.

On April 24, 2006, Special Agent contacted **VEGA** by telephone whereby they discussed transporting large quantities of narcotics from the United States/Mexico border and/or from Nacogdoches, Texas to points within the United States.

On May 4, 2006, CI-152 purchased approximately two ounces of cocaine from **ROMERO-FRAUSTO.**  CI-152 met **ROMERO-FRAUSTO** at 2415 Pettit St, Nacogdoches, Texas and was advised by **ROMERO-FRAUSTO** to meet him at the Exxon gas station located at the corner of Texas Highway 7 and Loop 224 East, Nacogdoches, Texas.  CI-152 met with **ROMERO-FRUASTO** at the aforementioned location along with another unidentified Hispanic male where the narcotics transaction was completed.  Physical surveillance and consensually recorded conversations verified this transaction.

On May 9, 2006, agents observed **VEGA** at the residence of **REYES** located at 1314 Virginia, Nacogdoches, Texas. SA Benavides contacted **VEGA** by telephone while agents were observing **VEGA** via remote surveillance.  Agents observed **VEGA** and **REYES** meet and converse in the front of 1314 Virginia, Nacogdoches, Texas.  A short time later contact was re-established with **REYES** via mobile surveillance as **REYES** was departing 1501 W. Main St, Nacogdoches, Texas.

On May 10, 2006, SA Benavides met with **VEGA** to discuss transporting and distributing narcotics for the organization.  **VEGA** directed SA Benavides to meet him at the gas station located directly across the highway from the El Castillo Club 2003 located off U.S. Highway 59 South in Nacogdoches, Texas.  Agents observed **REYES'** vehicle at the El Castillo Club 2003 at the initiation of the surveillance.  SA Benavides met with **VEGA** and was instructed to follow **VEGA** to his residence located at 1359 FM 843, Lufkin, Texas.  During this meeting, **VEGA** informed SA Benavides that he had buyers of cocaine in Georgia, Florida, and New York;  that he had buyers of marijuana in Alabama.  He went on to state that he moves about 10 kilograms of cocaine a week.  **VEGA** needs a driver to drive the narcotics to one of these states.  He informed SA Benavides that from Houston to Lufkin he pays $5.00 a pound to transport the marijuana.  From Lufkin to Alabama he will pay $15.00 a pound.  That he delivers from 200 to 400 pounds of marijuana to his buyers in Alabama.  During this meeting, **VEGA** indicated that he was working for **REYES.**

On June 8, 2006, a federal search warrant was executed at **VEGA'S** residence, which is located at 1359 F.M. 843 in Angelina County, Texas. Items recovered included a black spiral notebook with what appeared to be a drug ledger, miscellaneous documents, photographs of this suspect and other co-defendants, other documents, indicia of ownership of the property, firearms, cellular telephones and cell phone records, documents related to interstate travel, rental car receipts. A safe was recovered in the bedroom that contained $40,950.00 in cash along with numerous documents including three spiral notebooks with narcotics related notes.

On June 8, 2006, a federal search warrant was executed at **REYES'** residence, which is

24

located at 1314 Virginia in the city of Nacogdoches, Texas. Items recovered included two vehicles purchased with drug proceeds. One vehicle had a hidden area in a seat that contained a bundle of cash later determined to be $19,380.00. Numerous documents and five cellular telephones.

On June 8, 2006, a federal search warrant was executed at **CARRILLO'S**, which is located at 1221 Rodessa, Nacogdoches Texas. Items recovered included documents in the form of notes, personal phone books, spiral notebooks and several cellular phones.

On June 8, 2006, a federal search warrant was executed at **HIGUERRA'S**, which is located at 2415 Pettit in Nacogdoches, Texas. Items recovered included drug notes in the form of spiral notebooks, receipt books, photographs, titles to motor vehicles traded for narcotics, and several cellular telephones.

On June 8, 2006, a federal search warrant was executed at **SOLARES'** residence, which is located at 1501 W. Main Street in Nacogdoches, Texas. Items recovered included documents in the form of handwritten notes found throughout the residence, firearms, photographs, and several cellular telephones.

On June 8, 2006, in Norman, Oklahoma, FBI agents arrested **VEGA, FRAUSTO,** and **CANEDO.**  Agents had observed all three depart from **CANEDO's** residence prior to being pulled over on a traffic stop. Then an Oklahoma state search warrant was executed at 1194 36th Ave. Northeast, Norman Oklahoma.   Items recovered included approximately  cocaine, marijuana, firearms, scales, packaging material, documents and indicia of ownership related to Miguel Canedo. This evidence was submitted to the Department of Public Safety Crime Lab

25

where it was tested and it was in fact four kilograms of cocaine and 192 pounds of marijuana.

Defendant, Gilberto Vega, agreed with the above-stated facts and signed the Factual Resume. Counsel for Defendant and the Government attested to Defendant's competency and capability to enter an informed plea of guilty.   The Defendant agreed with the evidence presented by the Government and personally testified that he was entering his guilty plea knowingly, freely and voluntarily.

## RECOMMENDED DISPOSITION

**IT IS THEREFORE** the recommendation of the undersigned United States Magistrate Judge that the District Court accept the Guilty Plea of Defendant which the undersigned determines to be supported by an independent factual basis establishing each of the essential elements of the offenses charged in **Count I** of the charging **Second Superseding Indictment** on file in this criminal proceeding.   The Court also recommends that the District Court conditionally accept the plea agreement.[1]   Accordingly, it is further recommended that, Defendant, Gilberto Vega, be finally adjudged as guilty of the charged offenses under Title 21,

---

[1]"(3) Judicial Consideration of a Plea Agreement.
(A) To the extent the plea agreement is of the type specified in Rule 11(c)(1)(A) or (C), the court may accept the agreement, reject it, or defer a decision until the court has reviewed the presentence report.
(B) To the extent the plea agreement is of the type specified in Rule 11(c)(1)(B), the court must advise the defendant that the defendant has no right to withdraw the plea if the court does not follow the recommendation or request.
(4) Accepting a Plea Agreement. If the court accepts the plea agreement, it must inform the defendant that to the extent the plea agreement is of the type specified in Rule 11(c)(1)(A) or (C), the agreed disposition will be included in the judgment.
(5) Rejecting a Plea Agreement. If the court rejects a plea agreement containing provisions of the type specified in Rule 11(c)(1)(A) or (C), the court must do the following on the record and in open court (or, for good cause, in camera):
(A) inform the parties that the court rejects the plea agreement;
(B) advise the defendant personally that the court is not required to follow the plea agreement and give the defendant an opportunity to withdraw the plea; and
(C) advise the defendant personally that if the plea is not withdrawn, the court may dispose of the case less favorably toward the defendant than the plea agreement contemplated." FED. CRIM. P. 11(c)(3)-(5).

United States Code, Section 846.

Defendant is ordered to report to the United States Probation Department for the preparation of a presentence report.  At the plea hearing, the Court admonished the Defendant that the District Court may reject his plea and that the District Court can decline to sentence Defendant in accordance with the plea agreement, the federal sentencing guidelines and/or the presentence report because the sentencing guidelines are advisory in nature.  The District Court may defer its decision to accept or reject the plea agreement until there has been an opportunity to consider the presentence report.  *See* FED. R. CRIM. P. 11(c)(3).  If the Court rejects the plea agreement, the Court will advise Defendant in open court that it is not bound by the plea agreement and Defendant may have the opportunity to withdraw his guilty plea, dependent upon the type of the plea agreement. *See* FED. R. CRIM. P. 11(c)(3)(B).  If the plea agreement is rejected and Defendant still persists in the guilty plea, the disposition of the case may be less favorable to Defendant than that contemplated by the plea agreement.  Defendant has the right to allocute before the District Court before imposition of sentence.

## OBJECTIONS

Within ten (10) days after receipt of this report, any party may serve and file written objections to the report and recommendation of the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(C).  Failure to file written objections to the proposed findings of facts, conclusions of law and recommendations contained within this report within ten (10) days after service shall bar an aggrieved party from *de novo* review by the District Judge of the proposed findings, conclusions and  recommendations, and from  appellate review of factual findings and legal

27

conclusions accepted by the District Court except on grounds of plain error. *Douglass v. United Serv. Auto. Ass'n.,* 79 F.3d 1415 (5th Cir. 1996) (*en banc*); 28 U.S.C. § 636(b)(1). The constitutional safeguards afforded by Congress and the courts require that, when a party takes advantage of his right to object to a magistrate's findings or recommendation, a district judge must exercise its nondelegable authority by considering the actual evidence and not merely by reviewing and blindly adopting the magistrate's report and recommendation. *See Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir. 1983); *United States v. Elsoffer*, 644 F.2d 357, 359 (5th Cir. 1981) (per curiam).


**SIGNED this the 5th day of March, 2007.**


KEITH F. GIBLIN
UNITED STATES MAGISTRATE JUDGE